2021 IL App (1st) 181807-U

No. 1-18-1807

Order filed June 23, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CR 18967 |
| | ) | |
| NEHEMIAH SPENCER, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse and remand for a new trial where the trial court erred in failing to instruct the jury on defense of self. However, we affirm the trial court's denial of defendant's motion *in limine* seeking to present evidence of the victim's violent character.

¶ 2    Following a jury trial, defendant Nehemiah Spencer was found guilty of first degree murder and aggravated battery, then sentenced to concurrent terms of imprisonment of 35 and 5 years. The charges stemmed from a September 2014 altercation between defendant and Matthew Carr (Matthew) and Leroyce Noel where defendant used a knife to injure Matthew and kill Noel.

Matthew and Noel arrived at defendant's apartment after he had an argument with his girlfriend, Ainedia Carr (Ainedia). Matthew is Ainedia's uncle, and Noel is Matthew's friend. Defendant's defense at trial was that he acted in self-defense.

¶ 3     Prior to trial, defendant sought to present evidence of previous violent interactions between him and other members of Ainedia's family in order to support his claim of self-defense. The trial court denied defendant's motion to introduce this evidence. At trial, defendant and Matthew testified with differing accounts of the incident regarding who was the initial aggressor. Ultimately, the jury found defendant guilty of the first degree murder of Noel and the aggravated battery of Matthew. Although the parties agreed that the trial court would give the jury an instruction on self-defense, the court inadvertently failed to give that instruction. See Illinois Pattern Jury Instruction (IPI), Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.06).

¶ 4     On appeal, defendant contends that the trial court erred in failing to instruct the jury on self-defense. Defendant also contends that the court erred in denying his pretrial motion barring him from presenting evidence of prior altercations he had with Matthew and other members of Ainedia's family. Finally, defendant contends that his sentence is excessive where the trial court erred in treating the crime itself as the primary aggravating factor. For the reasons that follow, we reverse in part and affirm in part the circuit court's judgment and we remand for a new trial.

¶ 5                                    I. BACKGROUND

¶ 6                              A. Pretrial *Lynch* Motion

¶ 7      Prior to trial, defendant filed a motion *in limine* seeking an order allowing defendant and his witnesses to testify to prior acts of certain State witnesses in order to corroborate defendant's affirmative defenses. In the motion, defendant asserted that he would testify that on "prior

occasions when he and his wife[1] (Aineida[2] [*sic*] Carr) had words she would threaten to and often call her cousin (Lloyd Carr) [("Lloyd")] and other relatives to come to her aid." Defendant would specifically refer to five confrontations he had with Lloyd at Ainedia's behest. Defendant attached to his motion "proffers" to demonstrate that he "had prior knowledge of the violent tendencies of the relatives of his wife, Aineida [*sic*] Carr, particularly her relative, Matthew Carr, a complainant in this cause." Defendant asserted that the testimony about these violent tendencies was relevant to his state of mind when he attempted to defend himself on the date of the incident. Defendant asserted that this evidence was admissible pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984) because it showed that defendant's knowledge of the victim's violent tendencies affected his perceptions and reactions to the victim's behavior or because it supported defendant's version of the facts where there were conflicting accounts of what happened.

¶ 8      The "proffers" defendant attached to his motion were summaries of interviews a private detective conducted with defendant's mother, Rosemarie Spencer (Rosemarie), and defendant's brothers, Nicholas (Nicholas) and Joseph Smith (Joseph). In her proffer, Rosemarie recounted an incident that occurred in 2013 where defendant and Ainedia were arguing. Ainedia called Matthew, her brother Ricky Carr (Ricky), and her mother's boyfriend to come over and beat up defendant. She recalled a similar incident in 2012. In both cases, Rosemarie indicated that a police report was made of the incident. Joseph recounted an incident that occurred in April 2010 where Rosemarie called to tell him that defendant had been beaten up by Ainedia's family. Joseph drove to defendant's house, picked him up, and then drove him to their stepfather's house. As Joseph

---

[1]Ainedia is variously referred to throughout the record as defendant's wife and defendant's girlfriend. It appears that at the time of incident Ainedia was defendant's girlfriend and mother of his children.

[2]Ainedia's name is spelled a variety of ways in the record. This court will refer to her as "Ainedia."

was dropping defendant off at their stepfather's house, he saw "[Ainedia's] brother Ricky, [Ainedia's] uncle Matt, and another unknown subject driving toward him." Someone in the vehicle fired gunshots toward Joseph and defendant. Joseph drove to the police station where he filed a police report.

¶ 9     The State filed a response to defendant's motion in which it asserted that it searched Chicago Police Department records for police reports that were filed for any incidents where defendant was listed as victim. One police report indicated that on April 7, 2010, Ricky and "two unknown males 16-20 years of age" engaged in a verbal and physical altercation with defendant. Defendant was attacked by the three individuals and sustained injuries. Another police report indicated that on April 8, 2010, defendant and Joseph were in a vehicle when Ricky, who was 16 years old at the time, fired a gun at them. Ricky was the only listed suspect on the police report. The State indicated that Matthew was 36 years old at the time of trial and was 30 years old in 2010. Ricky was incarcerated at the time of the incident in this case in September 2014.

¶ 10    The State asserted that the evidence defendant sought to introduce was not admissible under *Lynch* because defendant was the initial aggressor in the confrontation and therefore was not entitled to raise the affirmative defenses of self-defense or defense of a dwelling. The State also contended that most of defendant's contentions concerned general allegations of confrontations with members of Ainedia's family, particularly Lloyd and Ricky. The State maintained that this evidence was not relevant because neither Lloyd nor Ricky were involved in the incident at bar. The State pointed out that none of the proposed proffers concerned Noel and there was no indication that Matthew was involved in any of the incidents described by Rosemarie and Joseph.

¶ 11 At the hearing on defendant's motion, defense counsel stated that defendant would testify that he did not invite Matthew and Noel into his home and that they burst through the door and started attacking him before he picked up a knife. Defendant would further testify that he had prior altercations with Matthew and other members of Ainedia's family. Defense counsel asserted that defendant's knowledge of Matthew's violent tendencies informed his state of mind and his decision to defend himself that day.

¶ 12 Defense counsel further acknowledged that based on the police reports submitted by the State, there was no suggestion that Matthew was involved in the shooting on April 8, 2010. He asserted, however, that Matthew was involved in the altercation on April 7, 2010. Nonetheless, defense counsel contended that he should be able to present evidence of both of these incidents to the jury because they demonstrated a longstanding contentious relationship between defendant and Ainedia's family.

¶ 13 The State responded that Ricky was listed as the sole perpetrator in the April 2010 incidents and he was in prison at the time of the altercation in this case in September 2014. The State noted that in Rosemarie's proffer, she did not specifically indicate that Matthew did anything to defendant. Rosemarie also indicated that police reports were filed in both incidents she described, but the State did not find evidence of any police reports. With regard to Nicholas and Joseph's proffers, the State contended that none of the incidents they described involved Matthew, but they instead tried "to put Matthew in there so that they can dirty up the entire family." The State therefore asked the court to deny the motion.

¶ 14 In ruling on the motion, the court noted that Noel was not involved in either of the April 2010 incidents, but defendant asserted that Matthew was involved. The court was "concerned," however, that when the incidents were reported, Matthew was not listed as an offender in either

incident, but Ricky was, along with two other offenders described as "15 [*sic*] to 20 years old." The court found that the proffers therefore could not be corroborated. The court stated that this was not a situation where all prior incidents between defendant and Ainedia's family could be admitted into evidence, but instead the incidents would have to relate directly to defendant's state of mind and the question of whether defendant was the initial aggressor.

¶ 15    The court acknowledged that there was a "volatile" relationship between the families, "but the volatile relationship between the family that occurred four years prior does not necessarily, I believe, meet the *Lynch* threshold standards here." The court noted, however, that it would consider whether the evidence could become admissible in surrebuttal or the defense's case-in-chief if the State opened the door for such evidence in its case-in-chief. The court concluded that it did not believe the April 2010 incidents had "nexus and reliability" necessary for them to be introduced under *Lynch*.

¶ 16                                B. Trial

¶ 17    On September 27, 2014, Cantrell Alexander, Ainedia's cousin, received a phone call from Ainedia where she was "frantic" and sounded as if "she wanted to leave." Alexander knew that Ainedia lived with defendant and their two children. Alexander met up with Matthew, Ainedia's uncle, and they, along with Noel, decided to go see Ainedia at her and defendant's apartment. Alexander drove Matthew and Noel to the apartment. Alexander testified that they were going there "to pick [Ainedia] up and that's it." Matthew and Noel went inside the apartment building while Alexander stayed in the vehicle because he had "health issues." When Matthew arrived at the apartment unit door, he heard defendant and Ainedia inside arguing. Matthew let Ainedia know that he was outside the door by "projecting [his] voice through the door." Matthew did not try to enter the apartment on his own, but someone opened the door. Matthew saw defendant standing in

front of the door and saw packed suitcases just inside the door. Matthew and Noel slowly entered the apartment. No one told them to come in, but Ainedia said, "Unc, here's all my stuff right here."

¶ 18    After they entered the apartment, defendant "launch[ed]" himself at Noel with "[h]is hand [making a] swinging motion towards [Noel's] body." When defendant stepped back from Noel, Matthew observed that defendant had a knife in his hand. Matthew saw Noel lean over onto defendant and then defendant pushed Noel onto the floor. At that point, Matthew grabbed the blade of the knife in defendant's hand because he was afraid defendant was going to stab him. Matthew held onto the blade of the knife while defendant held onto the handle as the two men "tussle[d]" around the apartment. At some point, defendant retrieved a second knife and used it to stab Matthew in the back "just a little bit." Defendant's brother Nicholas came into the room and held a machete to the back of Matthew's neck. Nicholas then led Matthew out of the apartment, down the stairs, and out of the building.

¶ 19    Outside, Matthew told Alexander, who was still in the vehicle, to call 911. Alexander noticed that Matthew's hand was bleeding and Matthew also had a "little pick" in his back. Ainedia came outside to the vehicle and was "hysterical."[3] Alexander gave her the phone so she could speak to the 911 operator. Defendant opened the window of the apartment and started screaming at Matthew on the street. Defendant was infuriated and told Matthew that his "homey is up there dead, bleeding out on his floor."

¶ 20    On cross-examination, Matthew testified that he was reluctant to go over to Ainedia and defendant's apartment because he knew what was happening there and he "never got [involved] in their squabbles." Alexander testified that Matthew and defendant "had like, little stuff before."

---

[3]The record shows that the State attempted to call Ainedia as a witness, but the State was unable to locate her.

¶ 21    Chicago police officer Brian Bratton testified that he responded to a call of "two people stabbed." When Officer Bratton arrived on the scene, he saw Ainedia and Matthew outside. Officer Bratton went upstairs to defendant's apartment and Nicholas let him inside. Officer Bratton went into the bedroom where he saw Noel lying on the floor between the door to the bedroom and the bed. Officer Bratton asked Noel questions, but Noel was unable to answer them.

¶ 22    Chicago police detective John Murray, who was assigned to investigate the incident, testified that when he arrived at the apartment, Officer Bratton directed him to a cabinet in the kitchen. Underneath the cabinet, Detective Murray discovered two knives. One of the knives had a curved blade and the other had a straight blade. Officer Bratton told Detective Murray that defendant had told him that the knives were located underneath the cabinet. A large machete was also recovered from one of the bedrooms.

¶ 23    Dr. Jon Gates, a Cook County Medical Examiner, testified that he performed an autopsy on Noel. During his examination, he noted that Noel had a stab wound on the left side of his chest that passed through his heart. Noel also had two "incised wound[s]" that were caused by "something such as a knife" on the back of his left thigh. Noel also had a blunt force injury on his forehead that could have been caused by a blow from a blunt object or could have been caused by a fall. Dr. Gates noted that Noel's hands had been photographed. He explained that hands are photographed in cases of assault "to show if there [were] any defensive wounds on the hands or if there were any injuries from fighting back during the assault." Dr. Gates testified he would expect to see bruising on a person's hands if they were involved a fist fight just prior to their death. He acknowledged, however, that he would not expect to see bruising on a person's hands if they were engaged in a "wrestling match" or were "grappling."

¶ 24 Dr. Gates noted that Noel's hands did not "show any defensive injuries or any injuries that he might have struck somebody else." Dr. Gates testified that the curved-blade knife recovered from the scene was consistent with the injury of the stab wound to Noel's chest. Dr. Gates testified that the stab wound to Noel's chest was "fatal" and that a person with that type of injury would be able to move around for "seconds to a minute or two maximum" after sustaining the injury.

¶ 25 Defendant testified on his own behalf that on September 27, 2014, he got into an argument with Ainedia because she wanted to take their children to Milwaukee. After the argument, defendant went to the store and then returned to the apartment. When he returned, he observed that Ainedia had packed all of her clothes and the children's clothes into suitcases. Ainedia told defendant that someone was coming to pick her up, and then told him when her ride had arrived. Defendant testified that he was not going to stop her from leaving, so he opened the apartment door for her. When defendant opened the door, he saw Matthew and Noel in the hallway. Defendant did not hear any voices in the hallway or hear anyone knock on the door before he opened it.

¶ 26 Defendant testified that when he opened the door, Noel hit him in the face and then Matthew "barged into the home and started attacking [him]." Defendant testified that the only thing he could do was protect himself so he ducked his head and covered up. Defendant then pulled out a knife. Defendant testified that he carried the knife with him "[p]retty much" all the time. Defendant "just started swinging" the knife while Matthew and Noel continued to hit him. Defendant was not sure if he hit "anything" while he was swinging the knife, but he was "pretty sure" that he did. He testified, however, that neither Matthew nor Noel had any reaction to him swinging the knife at them.

¶ 27    Defendant testified that he continued to struggle with Matthew around the apartment. Matthew grabbed onto the blade of defendant's knife while defendant and Matthew fought for control of the knife. Nicholas then came into the room, grabbed Matthew, and "escorted" him out of the apartment with the machete. After Nicholas and Matthew left the apartment, defendant observed that Noel was injured and bleeding in one of the bedrooms. Defendant testified that he could not do anything to help Noel because he was not a paramedic. He then went to the window where he argued with Matthew down on the street. Defendant testified that he was upset and he told Matthew that "your homey up here bleeding. He might bleed out." Defendant testified that he was scared when he saw Matthew and Noel standing outside the door because he had been in "prior altercations" with members of Ainedia's family before. Defendant testified that all of those "problems" started when Ainedia would call her family members over to their apartment. Defendant testified that it "always ends bad, you know, fights, you know, couple other things."

¶ 28    On cross-examination, defendant testified that he stabbed Matthew with the curved-blade knife, but did not use the straight-bladed knife that was also found in his apartment. Defendant testified that he did not see Noel or Matthew with any guns or knives or other weapons when they entered the apartment. Defendant acknowledged that he led police to the two knives located underneath the kitchen cabinet, but he denied placing the knives there.

¶ 29    In rebuttal, the State called Detective Murray who testified regarding the videotaped statement defendant gave to police after his arrest. The State then played excerpts of defendant's electronically recorded interview (ERI) with Detective Murray. In the ERI, defendant stated that Ainedia opened the door when Noel and Matthew arrived at their apartment.

¶ 30    Following the close of the evidence, the court conducted a jury instruction conference with the parties. The parties agreed at the conference that the jury would be provided with IPI Criminal

4th No. 24-25.06, which defines justifiable use of force in defense of self or another. At a subsequent hearing, the State tendered IPI Criminal 4th No. 24-25.06. Defense counsel stated that he had no objection to the instruction and the trial court accepted the instruction. In instructing the jury, however, the trial court did not read IPI Criminal 4th No. 24-25.06 to the jury or include it in the written instructions to the jury. Following closing argument, the jury found defendant guilty of the first degree murder of Noel and the aggravated battery of Matthew.

¶ 31                                    C. Sentencing

¶ 32    At defendant's sentencing hearing, the State presented the testimony of Chicago police officer Gomez.[4] Officer Gomez testified that in June 2010, he responded to a call for a domestic disturbance. When he arrived on the scene, he spoke to Ainedia, who he noted had a swollen bottom lip. Ainedia told Officer Gomez that she had been in a "verbal altercation" with defendant and that defendant had punched her with "closed fists." Ainedia attempted to leave the apartment, but defendant ripped her clothes off and then told her to walk home like that. Officer Gomez arrested defendant.

¶ 33    Following the arguments in aggravation and mitigation, the court first considered whether defendant's sentences on the two convictions would run consecutively. The court determined that the sentences would not run consecutively because there was insufficient evidence that Matthew suffered great bodily harm. In determining defendant's sentence, the court found that the crime was "very, very senseless." The court stated that it considered the statutory factors in aggravation and mitigation, and the parties' arguments in aggravation and mitigation. The court observed that defendant was not a young adult or juvenile at the time of the incident, had a normal childhood,

---

[4]Officer Gomez's first name is not included in the record filed on appeal.

and had no history of cognitive difficulties. The court found that the aggravating factors were "the crime and the crime itself and the planning of the crime, and also the fact that this did not stop when he stabbed the victim one time." The court determined that there was "no question" that defendant was the aggressor and that his actions were "egregious with the fact that a knife was used and how the knife was used ***." The court then sentenced defendant to 35 years' imprisonment on the first degree murder conviction and a concurrent five-year sentence on the conviction for aggravated battery.

¶ 34    Defendant filed a motion to reconsider his sentence in which he asserted, *inter alia*, that the State improperly argued in aggravation facts that were inherent in the offense for which defendant was found guilty. The trial court denied defendant's motion to reconsider his sentence finding that during defendant's sentencing hearing, it had examined the sentencing statutory factors in aggravation and mitigation as well as non-statutory factors. The court stated that it had also considered the "respective tiers of sentencing, that being punishment, rehabilitation, retribution, and also deterrents." This appeal follows.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, defendant contends that the trial court erred in mistakenly failing to instruct the jury on self-defense. Defendant also contends that the court erred in barring him from presenting evidence of Matthew's participation in the April 2010 shooting. Defendant maintains that this evidence was admissible under *Lynch*. In the alternative, defendant asserts that his trial counsel was ineffective in failing to present other evidence previous instances of Matthew's violent interactions with defendant, including the evidence contained in Rosemarie's proffer. Finally, defendant contends that his sentence is excessive and that the trial court erred in treating the crime itself as the primary aggravating factor.

¶ 37                                    A. Jury Instructions

¶ 38     We will first address defendant's contention that the trial court erred in failing to instruct

the jury on self-defense. Defendant concedes that he forfeited this argument by failing to object

when the trial court did not give the instruction and by failing to raise the issue in a posttrial motion

(See *People v. McCarter*, 385 Ill. App. 3d 919, 927 (2008)), but asserts that pursuant to Supreme

Court Rule 451(c) (eff. Apr. 8, 2013), forfeiture should not apply because the principles of

fundamental fairness require that the jury be properly instructed. Rule 451(c) provides that

"substantial defects [in jury instructions in criminal cases] are not waived by failure to make timely

objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013); *People

v. Hopp*, 209 Ill. 2d 1, 8 (2004). Rule 451(c) is "coextensive" with the plain error rule of Supreme

Court Rule 615(a), "and we construe these rules 'identically' " *People v. Herron*, 215 Ill. 2d 167,

175 (2005) (quoting *People v. Armstrong*, 183 Ill. 2d 130, 151 n. 3 (1998)).

¶ 39     The State acknowledges that the trial court did not give the jury IPI Criminal 4th No. 24-

25.06 in its instructions, but asserts that defendant has affirmatively waived the issue for review

because defense counsel made a strategic decision to not have that instruction tendered to the jury.

The State further maintains that in the event we find that the argument is not affirmatively waived,

that defendant cannot show plain error because the other instructions given to the jury covered the

same subject matter as IPI Criminal 4th No. 24-25.06, and because the evidence was not closely

balanced.

¶ 40                                    1. *Forfeiture or Waiver*

¶ 41     Before we can address the merits of defendant's argument, we must first determine whether

defendant forfeited this argument by not raising it before the trial court as defendant asserts, or

whether he affirmatively waived the argument by strategically deciding to not pursue a self-

defense instruction, as the State suggests. Forfeiture is "the failure to make the timely assertion of [a] right." *People v. Lesley*, 2018 IL 122100, ¶ 37. "Waiver, on the other hand, 'is an intentional relinquishment or abandonment of a known right or privilege.' " *People v. Sophanavong*, 2020 IL 124337, ¶ 20 (quoting *Lesley*, 2018 IL 122100, ¶ 36). The distinction, for our purposes here, is an important one because when a defendant "forfeits" an argument, we may still review that issue on appeal through the plain error doctrine. See, *e.g., People v. Boston*, 2016 IL App (1st) 133497, ¶ 56, *People v. Johnson*, 2015 IL App (1st) 141216, ¶ 16. Where a defendant affirmatively waives an argument, however, defendant also waives for review a claim of error on the waived issue. *People v. Stewart*, 2018 IL App (3d) 160205, ¶ 20. The rationale for this rule is that a party who acquiesces in proceeding in a given manner cannot show he was prejudiced by the proceeding. *Id.* ¶ 19 (citing *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989)). Stated another way:

> "a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *Id.* (quoting *In re Detention of* Swope, 213 Ill. 2d 210, 217 (2004)).

Accordingly, we must first determine whether defendant forfeited this claim, and thus whether we may review the claim of error under the plain error doctrine or Rule 451(c), or whether defendant affirmatively waived the issue.

¶ 42    An examination of the record reveals that defense counsel consistently asserted throughout the proceedings that defendant's defense to the charged offenses was self-defense. For instance, in defendant's answer to the State's motion for pretrial discovery, defendant indicated that his "defense to the offense charged is use of force *in defense of person* and dwelling ***." (Emphasis

added.) Similarly, in his motion *in limine* seeking to introduce evidence pursuant to *Lynch*, defendant asserted that he "entered a plea of guilty [*sic*] and asserted self-defense." In addition, in discussing the progression of trial with defense counsel at a hearing prior to the *Lynch* hearing, the court asked defense counsel: "And reasonable doubt is your defense." Defense counsel responded: "That and defense of dwelling and self." Plainly, the fact that defendant filed a pretrial motion pursuant to *Lynch* at all is compelling evidence that defendant intended to assert a claim of self-defense based on IPI Criminal 4th No. 24-25.06. See, *e.g.*, *People v. Cook*, 352 Ill. App. 3d 108, 114 (2004) (stating that where a defendant raises self-defense as an affirmative defense, the defendant is permitted to present evidence of the victim's aggressive and violent character to demonstrate which part was the aggressor pursuant to *Lynch*).

¶ 43 Before formalizing the instructions to be given in this case, the court held a preliminary conference where it discussed what instructions the parties would be seeking. In addressing defense counsel, the court asked if there were any instructions that defendant was seeking. Defense counsel replied: "I'm asking for the self-defense instruction." The parties and the court then discussed how to instruct the jury on second degree murder. Defense counsel left the courtroom to speak with defendant, and when he returned, he informed the court that they were requesting that "the jury to be instructed on not only self-defense but second degree." The court indicated that caselaw suggested that if the court instructed the jury on self-defense, it was also required to instruct the jury on second degree murder. Defense counsel responded: "That's fine. That's our main argument anyway." The jury instruction conference took place the very next day. When the State tendered IPI Criminal 4th No. 24-25.06 as People's Instruction No. 17, defense counsel responded, "No objection."

¶ 44    Thus, the record shows that defense counsel repeatedly and consistently apprised the court that he was seeking to present a claim of self-defense and defense counsel structured his case-in-chief around that defense. The only deviation from defense counsel's consistent assertion that defendant was asserting a claim of self-defense came after the trial court instructed the jury. After the jury began its deliberations, the following colloquy took place:

"STATE'S ATTORNEY: The second one I need to change the language which is People's instruction 16, [24-25] was that terminate another's unlawful entry. Did I miss that or—

THE COURT: What are you talking about? I don't know what you're talking about. Are you saying I didn't read 24[?]

STATE'S ATTORNEY: No, I'm saying you did. I thought I had—I thought I had it wrong. But maybe I just got lost in which—self-defense ones are kind of similar.

THE COURT: Okay. Let's see if we can correct that.

STATE'S ATTORNEY: I just want to make sure that number 16 is correct, Judge. If you could just take a look at People's 16, and if you say it's correct then we're all good.

THE COURT: Number 16 is 11—no, that's the proposition. I got 16 as being the proposition. Proposition of aggravated battery I got 16. Are my numbers wrong?

[STATE'S ATTORNEY]: I don't think so, Judge. It's 24 dash 25.06. That's the one where I thought I had gotten it wrong.

THE COURT: That's [People's Instruction No.] 17.

[STATE'S ATTORNEY]: Okay.

THE COURT: At least that's what I got.

> [STATE'S ATTORNEY]: Okay. As long as you say that that's correct then I might have just gotten lost. I was writing something down with the other ones so…
>
> THE COURT: Okay, I think it's correct. Do you have any problem with that?
>
> [DEFENSE COUNSEL]: Is that [24-]25.06?
>
> THE COURT: Right.
>
> [DEFENSE COUNSEL]: I have it marked not given."

The parties did not discuss the missing instruction any further.

¶ 45    Thus, defense counsel seemed to acknowledge that the requested self-defense instruction was not given, but did not ask the court to give the overlooked instruction or otherwise object. This interaction is the basis for the State's contention that defendant affirmatively waived this argument. The State asserts that defense counsel never specifically requested IPI Criminal 4th No. 24-25.06, but rather sought only the defense of a dwelling instruction. Illinois Pattern Jury Instruction, Criminal, No. 24-25.07 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.07). We find this assertion is not supported by the record. It is clear from defense counsel's representations to the court and his pleadings that defense counsel intended to assert claims of *both* self-defense *and* defense of a dwelling. A defendant is entitled to assert both of these affirmative defenses simultaneously and have the court instruct the jury on both defenses. See *People v. Morris*, 162 Ill. App. 3d 1046, 1055 (1987) (citing *People v. Stombaugh*, 52 Ill. 2d 130, 135 (1972)). It would strain credulity to suggest that defense counsel would pursue a claim of self-defense throughout the proceedings, consistently requesting that the jury be instructed on self-defense, and then, only after the jury had entered into deliberations, decide to affirmatively abandon that argument. While it is unclear why, precisely, defense counsel did not seek to have the court correct its error and

provide the jury with IPI Criminal 4th No. 24-25.06, we cannot say that defense counsel's actions amounted to an affirmative waiver of this issue.

¶ 46    Nonetheless, this court has consistently found that even where a defendant fails to request the proper instruction or fails to object to its absence, the importance of the jury being properly instructed is so fundamental that principles of waiver may give way to principles of fundamental fairness. *People v. Martinez*, 76 Ill. App. 3d 280, 283 (1979).

> "While the failure to tender a particular instruction may constitute a waiver of any claim that the instruction should have been given, we believe the defendant's failure to tender [IPI Criminal 4th No. 24-25.06] is not as important with reference to fundamental fairness as the quintessential requirement that the jury be properly instructed when one stands to lose his liberty. Where self-defense is an issue, it is the judge's responsibility to make certain the jury is fully informed by giving [IPI Criminal 4th No. 24-25.06]. This obligation cannot be waived by defense counsel's failure to tender the appropriate instruction or object to the instruction given. To be consistent with [prior precedent], we apply Supreme Court Rule 451(c) which "relaxes the waiver doctrine whenever there are *** substantial defects rising to the level of plain error. [citation]." (Internal quotation marks omitted.) *Id.*

¶ 47                                  2. *Plain Error*

¶ 48    However, that is not the end of our inquiry. Finding defendant forfeited the issue, rather than affirmatively waived it, merely allows us to determine whether we may review defendant's forfeited claim for plain error, as an analog to Rule 451(c). The plain-error doctrine permits a reviewing court to consider unpreserved errors when " '(1) the evidence in a criminal case is closely balanced or (2) where the error is so fundamental and of such magnitude that the accused

was denied a right to a fair trial.' " *People v. Harvey*, 211 Ill. 2d 368, 387 (2004) (quoting *People v. Byron*, 164 Ill. 2d 279, 293 (1995)). "[A]n omitted jury instruction constitutes plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Hopp*, 209 Ill. 2d at 12.

¶ 49     In determining whether the evidence was closely balanced, a reviewing court must make a "commonsense assessment" of the evidence. *People v. Belknap*, 2014 IL 117094, ¶ 52. To show that the evidence was closely balanced, a defendant must show that the error was prejudicial, *i.e.*, that the error alone severely threatened to tip the scales of justice against him. *People v. Adams*, 2012 IL 111168, ¶ 21 (quoting *Herron*, 215 Ill. 2d at 187). Under the second prong of plain-error review, however, "[p]rejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' " (Emphasis in original.) *Herron*, 215 Ill. 2d at 187 (quoting *People v. Blue*, 189 Ill. 2d 99, 138 (2000)). To determine whether the purported error is "plain" requires a "substantive look" at the error. *People v. Durr*, 215 Ill. 2d 283, 299 (2005). If, at the end of our analysis, we determine that the error does not rise to the level of plain error, we will honor defendant's forfeiture of this issue. *Id.* We review *de novo* the question of whether the jury instructions accurately stated the applicable law to the jury. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 50                                         i. Error

¶ 51     The State does not dispute that defendant presented sufficient evidence at trial to raise the affirmative defenses of justifiable use of force in defense of a person and in defense of a dwelling. A defendant need only present some evidence of an affirmative defense in order to raise the defense and justify an instruction. *People v. Pegram*, 124 Ill. 2d 166, 173 (1988). Moreover, Illinois

Supreme Court Rule 451(a) requires that in a criminal case, if the court determines the jury should be instructed on a subject, and the IPI, Criminal, contains an applicable instruction, then the IPI instruction "shall" be given unless the court determines it does not accurately state the law. See Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). Here, both parties agreed at trial that the self-defense instruction was appropriate, and the court agreed to give the instruction.

¶ 52    Although both parties agree that the trial court ultimately failed to instruct the jury on self-defense by instructing the jury with IPI Criminal 4th No. 24-25.06, the parties disagree as to whether that omission constituted error. Defendant contends that the omission was plain error because the court failed to instruct the jury on a vital aspect of defendant's case. Defendant points out that without the instruction, the jury did not have the definition of a justifiable use of force and was not informed that the State had the burden to rebut defendant's claim of self-defense. The State contends, however, that the omission of IPI Criminal 4th No. 24-25.06 from the jury instructions was not in error because the jury was adequately informed on the principles of self-defense through other instructions and through closing argument.

¶ 53    The State points out that although the trial court did not instruct the jury on use of force in defense of a person, IPI Criminal 4th No. 24-25.06, the court did instruct the jury on use of force in defense of a dwelling, IPI Criminal 4th No. 24-25.07. The State asserts that the defense of dwelling instruction not only conveyed the same information contained in the self-defense instruction, but was actually an even more favorable instruction because the defense of a dwelling instruction does not require danger to life or great bodily harm for the defendant to be justified in the use of deadly force.

¶ 54    In order to assess the State's argument on this issue, we must examine the text of both instructions. IPI Criminal 4th No. 24-25.06 provides:

"Use Of Force In Defense Of A Person

A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [(himself) (another)] against the imminent use of unlawful force.

[However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [(imminent death or great bodily harm to [(himself) (another)]) (the commission of ____)].]"

In reading IPI Criminal 4th No. 24-25.07, "Use Of Force In Defense Of A Dwelling," to the jury, the trial court in this case stated:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to terminate another's unlawful entry into a dwelling.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent an[] assault upon himself or another *** in the dwelling."

The trial court's version of IPI Criminal 4th No. 24-25.07 resembled the version in the IPI. The court did omit an optional portion of the instruction that provides that a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if "the entry is made or attempted in a violent, riotous, or tumultuous manner and he reasonably believes that such force is necessary to prevent an [(assault upon) (offer of personal violence to)] himself or another then in the dwelling."

- 21 -

¶ 55    Thus, both instructions provide that a person is justified in the use of force in certain situations; however, there is a key distinction between the two. The defense of dwelling instruction refers to another's "unlawful entry into a dwelling." Although the altercation in this case unquestionably took place in defendant's "dwelling," there was a question as to whether Matthew and Noel's entry was "unlawful." Thus, if the jury credited Matthew's testimony that either Ainedia or defendant opened the apartment door and invited them in, then defendant's defense of dwelling claim would be defeated because there would be no unlawful entry. The defense of a person instruction, however, has no such limitation. It provides that a person is justified in the use of force intended to likely to cause great bodily harm or death if he "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself another." IPI Criminal 4th No. 24-25.06. Thus, the instructions are not coextensive.

¶ 56    The State asserts, however, that the "unlawful entry" language of IPI Criminal 4th No. 24-25.07 modifies only the first paragraph of the instruction, but the second paragraph does not mention unlawful entry and merely states that deadly force is justified where defendant reasonably believes that such force is necessary to prevent an assault on someone inside the dwelling. At oral argument before this court, the State contended that the court's omission of the optional portion of the instruction concerning an entry made in a "violent, riotous, or tumultuous manner" eliminated the "unlawful entry" requirement from the second paragraph of the instruction and functionally turned that paragraph into a *de facto* self-defense instruction. We find the State's proposed interpretation of IPI Criminal 4th No. 24-25.07 unpersuasive. The instruction's second paragraph, as given by the trial court, begins with "However," which clearly refers back to the first paragraph. The first paragraph provides that a person is justified in using force to the extent that he reasonably believes that such conduct is necessary to terminate another's unlawful entry into a dwelling. The

second paragraph then answers the question of when a person may use "force which is intended to likely to cause death or great bodily harm" to terminate an unlawful entry. Indeed, this second paragraph is surrounded by brackets in the instructions. The committee notes to the instruction provide that the court should use "the bracketed paragraph when there is some evidence that the force used by the defendant was likely to cause death or great bodily harm." IPI Criminal 4th No. 24-25.07, Committee Note. Thus, the distinction between the two paragraphs is on the amount of force used, and the second paragraph is not intended to sidestep the unlawful entry requirement. In short, "[i]n order to justify the use of force in defense of dwelling, *the entry into the dwelling must be unlawful* or there must be an attack upon a dwelling." (Emphasis added.) *People v. Ellis*, 107 Ill. App. 3d 603, 613 (1982). The court's omission of the other optional paragraph did not change this prerequisite. Thus, the instructional errors did not amount to a windfall for defendant as the State suggests.

¶ 57    The State next contends that there is no error because the State essentially read IPI Criminal 4th No. 24-25.06 in its entirety to the jury during closing arguments. The record shows that during closing arguments the assistant State's Attorney stated:

> "And third, that the defendant was not justified in using the force he used. The judge is going to give you an instruction on this. And he will tell you a person is justified in the use of force when and to the extent he reasonably believes that such conduct is necessary to defend himself and/or another against the imminent use of unlawful force.
>
> ***
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent the imminent death or great bodily harm to himself and/or another."

 In support of its contention that this explanation during closing argument was sufficient to remedy the trial court's failure to read the self-defense instruction, the State relies on *People v. Huckstead*, 91 Ill. 2d 536 (1982). In *Huckstead*, the supreme court found that there was no plain error where the trial court failed to instruct the jury that the State had to prove beyond a reasonable doubt that the defendant was not justified in using the force that he used. *Id.* at 547 The court determined that any error had essentially been cured because defense counsel in closing argument "repeatedly and specifically emphasized that the State had the burden of proving defendant was not justified in the force he used." *Id.* at 545. The court also noted that although the trial court did not instruct the jury on the State's burden, it did inform the jury that:

> "the defendant was justified in using deadly force if he reasonably believed that force was necessary to prevent imminent death or great bodily harm to himself (IPI Criminal No. 24.06), that the defendant did not have to prove his innocence and that the burden of proof remained with the State throughout the trial (IPI Criminal No. 2.03)" *Id.* at 544-45.

The court also noted that in addition to defense counsel "repeatedly and specifically" emphasizing that the burden was on the State, the State acknowledged its burden in its rebuttal argument. *Id.* at 545.

¶ 58    We find the circumstances in *Huckstead* distinguishable from the case at bar. In *Huckstead*, both parties in closing argument acknowledged the State's burden "repeatedly and specifically" and the other instructions provided by the court highlighted the State's burden. In this case, however, none of the other instructions adequately filled in the gap left by the trial court's failure to tender the jury the self-defense instruction. Again, the defense of dwelling instruction only referred to defendant's use of force following an unlawful entry into his dwelling. Although we

recognize that the State did recite the instruction during its closing argument, it did not do so "repeatedly" in order to emphasize the definition of "justifiable use of force" in defense of a person. Indeed, the State referring to the language of the instruction, and informing the jury that the court would instruct the jury on the issue, could have served to only confuse the jury when the court ultimately omitted the instruction. See *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 56. As such, we find that the State's recitation of IPI Criminal 4th No. 24-25.06 in closing argument did not fill the "instructional gap" and excuse the court's error in this case. *People v. Berry*, 99 Ill. 2d 499, 506 (1984). Having found an error occurred, we must next determine whether the error rose to the level of a "substantial defect" under Rule 451(c). *People v. Getter*, 2015 IL App (1st) 121307, ¶ 56.

¶ 59                                    ii. Substantial Defect

¶ 60     As noted, Rule 451(c) is coextensive with the plain error doctrine, and thus we will use that terminology. *Id.* A defendant may show plain error resulting from the omission of a jury instruction where the defendant establishes that there was a "serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law." *People v. Sargent*, 239 Ill. 2d 166, 191 (2010). After considering the instructions as a whole, we find that the trial court's omission of IPI Criminal 4th No. 24-25.06 amounted to a "substantial defect" because the error was of such a magnitude as to have denied defendant a fair trial. *Cacini*, 2015 IL App (1st) 130135, ¶ 55. The primary omission from the instructions was the definition of the justifiable use of force in defense of a person. Viewing the instructions the court did provide demonstrates how this omission fundamentally impacted the fairness of defendant's trial. As noted, the trial court instructed the jury on defense of a dwelling under IPI Criminal 4th No. 24-25.07. That instruction provides that "[a] person is justified in the use of force when and to the extent that he reasonably

believes that such conduct is necessary to terminate another's unlawful entry into a dwelling." In conjunction with this instruction, the court also gave IPI Criminal 4th No. 24-25.06A "An Issue In Defense Of Justifiable Use of Force." IPI, Criminal, No. 24-25.06A (4th ed. 2000) (hereinafter "IPI Criminal 4th No. 24-25.06Á"). That instruction contains a single proposition: "That the defendant was not justified in using the force which he used."

¶ 61     With these two instructions, the jury was considering only whether defendant was justified in using force to terminate an unlawful entry into a dwelling. As discussed above, the jury could find no justification simply by finding no unlawful entry. Had the trial court properly instructed the jury on self-defense, however, the jury would have been provided with a second justification to consider:[5] "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [himself] against the imminent use of unlawful force." IPI Criminal 4th No. 24-25.06. Thus, the jury could have considered, despite Matthew and Noel's lawful entry into the apartment, whether defendant was still justified in his use of force if he reasonably believed it was necessary to defend himself. Such a conclusion could find some support in the record where defendant testified that Matthew and Noel were the initial aggressors and defendant only used the knife to defend himself. We do not mean to suggest that the jury should have credited defendant's testimony about the incident. Nor do we mean to suggest that we

---

[5]We note that the trial court also tendered IPI Criminal 4th No. 24-25.09 "Initial Aggressor's Use of Force." IPI, Criminal, No. 24-25.09 (4th ed. 2000). This instruction provides, as the trial court issued it to the jury, that:

> "A person who initially provokes the use of force against himself is justified in the use of force only if that force used against him is so great that he reasonably believes he is in imminent danger of *** death or great bodily harm.
>
> And he has exhausted every reasonable means to escape the danger other than the use of force which his likely to cause death or great bodily harm to another person."

Although this instruction may have provided other justifications for defendant's use of force, the additional criteria present, including that defendant exhaust every reasonable means to escape, demonstrates that it is not a substitute for IPI Criminal 4th No 24-25.06.

find defendant has demonstrated that had the jury been properly instructed on self-defense, that the jury would not have convicted him. That is not defendant's burden at this juncture. The plain error rule "does not require that defendant prove beyond doubt that [his] trial was unfair because the omitted instruction misled the jury to convict [him]." *Hopp*, 209 Ill. 2d at 12. It only requires him to show that the error caused "a *severe* threat to the fairness of [his] trial." (Emphasis in original.) *Id.* We find defendant has made such a showing.

¶ 62 Defendant raised only two defenses as trial: defense of self and defense of a dwelling.[6] During his testimony, defendant acknowledged that he used a knife and swung it at both Matthew and Noel. The "principal contested issue relevant to defendant's culpability" was whether he acted with justification in defending himself. *Id.* at 8 (citing *People v. Ogunsola*, 87 Ill. 2d 216, 223 (1981)). As such, "fundamental fairness" requires that the jury be instructed on self-defense. *Id.*

¶ 63 We find the supreme court's decision in *People v. Underwood*, 72 Ill. 2d 124 (1978) instructive. In that case, the defendant's theory of self-defense was that he "reasonably believed" that the force he used was necessary to prevent imminent death or great bodily harm to himself. *Id.* at 128. Both parties agreed "that the pivotal question before the jury was whether the defendant justifiably acted in self-defense." *Id.* The trial court instructed the jury that:

> " 'A person is justified in the use of force when and to the extent that he Reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

---

[6]We note that there is some suggestion in the record that before trial defendant was considering pursuing a defense of reasonable doubt, but the record shows that defendant clearly abandoned that defense before trial.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he Reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself.' " *Id.* (citing (IPI, Criminal, No. 24.06 (1968)).

During the conference on the jury instructions, the defendant tendered a non-IPI instruction to define the term "reasonably believes." *Id.* at 128-29. The court rejected the instruction. *Id.* at 129. Although the State advised the defendant of the proper instruction to define "reasonably believes," the defendant neither submitted the suggested instruction, nor requested time to prepare additional instructions. *Id.* Nonetheless, the defendant asserted before the supreme court that the trial court should have *sua sponte* instructed the jury on the definition of "reasonably believes." *Id.*

¶ 64 The supreme court rejected the defendant's argument finding that the jury was adequately instructed as to the law on the "substance" of the defendant's self-defense claim. *Id.* at 130. The court observed that the jury was instructed that the State had to prove beyond a reasonable doubt that the defendant was not justified in using the force that he used and was instructed on the definition of the justifiable use of force in self-defense. *Id.* The court noted, however, that "*had the court failed to instruct the jury on the law of self-defense*, we would agree that [precedent] would require the finding of a substantial defect." (Emphasis added.) *Id.*

¶ 65 The hypothetical situation described in *Underwood* is precisely what occurred in this case. The trial court failed to instruct the jury on the law of self-defense. As such, we find that the court's failure amounted to a substantial defect necessitating remand for a new trial.

"Under the circumstances of this case, [defendant's] failure to tender the appropriate IPI instruction was not as important with reference to the fundamental fairness of [his] trial as the requirement that the jury be fully and properly instructed. The failure to

instruct on this important aspect of the case necessitates a remand for a new trial." *People v. Joyner*, 50 Ill. 2d 302, 307 (1972).

¶ 66                                    B. Matthew's Prior Conduct

¶ 67    Although we have already found that remand is warranted, we will nonetheless address defendant's contention that the trial court erred in precluding him from introducing evidence of Matthew's prior conduct under *Lynch* because we find that this issue would likely recur on remand. See *Pielet v. Pielet*, 2012 IL 112064, ¶ 56. Specifically, defendant contends that the trial court erred in precluding him from introducing evidence that Matthew took part in an April 2010 shooting that targeted defendant. Defendant asserts that this evidence was admissible under *Lynch* because defendant raised a claim of self-defense and was therefore entitled to introduce evidence of the Matthew's character and prior violent acts to illustrate Matthew's violent character and show defendant's awareness of Matthew's violent tendencies.

¶ 68                                    1. *Plain Error*

¶ 69    Defendant concedes that he forfeited this argument by not raising the issue in a posttrial motion. *McCarter*, 385 Ill. App. 3d at 927. As before, however, he asserts that we may nonetheless review the trial court's ruling because the trial court's preclusion of this evidence amounted to plain error. As discussed, the first step of plain-error review is determining whether an error occurred. *People v. Walker,* 232 Ill. 2d 113, 124-25 (2009). Accordingly, we will first consider whether the trial court erred in denying defendant's motion *in limine*.

¶ 70                                    2. *Standard of Review*

¶ 71    "Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion." *Harvey*, 211 Ill. 2d at 392. Defendant asserts, however, that we should review this

issue *de novo* because the trial court's ruling denied him his constitutional right to present a defense. See, *e.g.*, *People v. Burns*, 209 Ill. 2d 551, 560 (2004) ("The standard of review for determining whether an individual's constitutional rights have been violated is *de novo*."). "However, when a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion." *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. As such, we will review the trial court's ruling for abuse of discretion. A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the view adopted by the trial court. *People v. Garcia*, 2012 IL App (2d) 100656, ¶ 17.

¶ 72                                    3. People v. Lynch

¶ 73    In *Lynch*, our supreme court held that "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *Lynch*, 104 Ill. 2d at 200. Defendant may use evidence of the victim's aggressive and violent character to support his claim of self-defense in two ways. *Id.* at 199-200. One is that "the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior." *Id.* at 200. The other is that "evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened." *Id.* In this case, defendant asserts that evidence of Matthew's prior violent interactions with defendant were admissible under both of these factors.

¶ 74                              4. *The Trial Court's Ruling*

¶ 75    We first observe that the parties disagree as to the effect of the court's ruling on this issue. The evidence of the April 2010 shooting was contained in Joseph's proffer that was attached to

defendant's motion *in limine*. The State asserts that the court did not bar Joseph's testimony and, in fact, never ruled on Joseph's proffer at all, because defense counsel withdrew the proffer after the State presented police reports showing that Matthew was not involved in the shooting. After withdrawing the proffers, defendant sought to introduce only his own testimony of his prior altercations with Matthew, which did not include the April 2010 shooting. Defendant asserts that the court did rule on the proffer and barred the testimony. In order to address this contention, and defendant's contention that the court did, in fact, rule on the proffers and erred in precluding them, we must examine the *Lynch* hearing and the court's ruling.

¶ 76    In the proffer attached to defendant's motion *in limine*, Joseph recounted an incident that occurred in April 2010 where Rosemarie called to tell him that defendant had been beaten up by Ainedia's family. Joseph drove to defendant's house, picked him up, and then drove him to their stepfather's house. As Joseph was dropping defendant off at their stepfather's house, he saw "[Ainedia's] brother Ricky, [Ainedia's] uncle Matt, and another unknown subject driving toward him." Someone in the vehicle fired gunshots toward Joseph and defendant. Joseph drove to the police station where he filed a police report. The police reports submitted by the State indicated that on April 7, 2010, Ricky and "two unknown males 16-20 years of age" engaged in a verbal and physical altercation with defendant. Defendant was attacked by the three individuals and sustained injuries. Another police report indicated that on April 8, 2010, defendant and Joseph were in a vehicle when Ricky, who was 16 years old at the time, fired a gun at them. Ricky was the only listed suspect on the police report.

¶ 77    At the hearing on defendant's *Lynch* motion, defense counsel told the court that he had not seen the police reports the State submitted in support of its response to the motion *in limine*. The court passed the case, so that defense counsel could review the police reports. When the matter

was recalled, defense counsel stated that he would "simplify this." Defense counsel then argued that defendant would testify that Matthew and Noel were the initial aggressors, and that defendant had "prior confrontations with Matthew [] along the same lines that occurred" on September 27, 2014. Defense counsel asserted that defendant's knowledge of Matthew's violent tendencies was relevant not only to defendant's state of mind on the night of the stabbing, but also relevant for the trier of fact to consider because the jury would hear two different versions of the incident at trial. Defense counsel concluded:

> "And therefore, [] I'll put aside the proffer that I made in my motion. I'll put that aside. You can rule whatever, I can save that for surrebuttal, but my client is going to testify.
>
> ***
>
> And need be these people that witness [*sic*] these other confrontations I will save them for surrebuttal."

¶ 78   The court then asked defense counsel what incidents he sought to introduce.

> [DEFENSE COUNSEL]: Well, Judge, specifically, at this point, the incident [defendant] who's the person who is shot at I have never—
>
> THE COURT: What's the date? What's the date of that[?]
>
> [DEFENSE COUNSEL]: Well, that's where we have problems, Judge. Strike that. That's in one of the police reports where, I think, they talked to Joseph [Smith].
>
> THE COURT: So the shots are fired allegedly by—
>
> [DEFENSE COUNSEL]: By a member of the [Carr] family after an incident between [Ainedia] and [defendant].

THE COURT: Are the shots fired either by Matthew or by another victim in this matter?

[DEFENSE COUNSEL]: No.

THE COURT: Unidentified member of the [Carr] family.

[DEFENSE COUNSEL]: Rick [Carr], not unidentified[.] Mr. [Smith] said it was Rick [Carr] that fired the bullet.

THE COURT: And that's the 16 year old. It was the 16 year old who shot. And what's Rick [Carr's] relationship to Matthew [Carr]?

[DEFENSE COUNSEL]: Nephew. And I supposed [*sic*] it's the difficulty of our position other than my client's testimony, but, and I think, nonetheless, it goes to his state of mind that due to his compendious [*sic*] relationship with his wife who summoned her family members to settle[] those situations, it creates in my client's mind what's going to happen when those two guys, specifically Matthew, come[] through that door after another argument with his wife."

After hearing further arguments from the parties, the court noted that a police report was not required for evidence to be introduced under *Lynch*. The court stated, however, that it had a responsibility to keep out evidence that "may be unreliable, unverifiable or, frankly, to be scripted by someone with an interest to the outcome of the case ***." The court observed that defendant sought to introduce evidence of two incidents that occurred in April 2010, four years before the altercation in this case. There court noted that there was no suggestion that Noel was involved in either incident, but defendant would testify that Matthew was.

¶ 79    The court stated that it was concerned about the fact that when the incidents were reported to police, there was no indication that Matthew was involved, and, in fact, Ricky was named as

the offender and the other offenders were listed as "15 [*sic*] to 20 years old." The court found that this showed that the interviews in the proffers could not be corroborated. The court stated that this case did not represent a situation where all prior incidents between defendant and Ainedia's family could come in. "It has to directly relate to the issues involved here. And the issues involved here is [*sic*] the defendant's state of mind and the question of whether or not the victim was the initial aggressor here." The court acknowledged that there was a volatile relationship between the families, "but the volatile relationship between the family that occurred four years prior does not necessarily, I believe, meet the *Lynch* threshold standards here." The court allowed that the evidence may come in during the defense's case-in-chief or in surrebuttal if the State opened the door for such evidence in its case-in-chief. The court concluded that the April 2010 incidents did not have the "nexus and reliability" necessary for them to be introduced under *Lynch*. The court also noted that it was "not asked to rule on the other alleged allegations by Joseph Smith or by [Rosemarie]."

¶ 80    Thus, despite the State's arguments to the contrary, the record is clear that the trial court did rule on the admissibility of the April 2010 shooting. The language seized on by the State that the court was "not asked to rule on the *other* alleged allegations" by Joseph and Rosemarie clearly refers to the other incidents described in their proffers, and not the April 2010 shooting as the State suggests. Although defense counsel suggested that this evidence would come in through defendant rather than Joseph, defendant nonetheless sought to admit this evidence, and the trial court barred its admission. Accordingly, we will next address defendant's contention that the court erred in refusing to permit defendant to introduce evidence of the April 2010 shooting.

¶ 81                          5. *No Abuse of Discretion*

¶ 82    Having found that the trial court did, in fact, rule on the admissibility of the April 2010 shooting, we must now determine whether the trial court abused its discretion in reaching that determination. We observe that there is a somewhat convoluted record of what evidence, precisely, defense counsel sought to offer on this topic. As noted, Joseph, in his proffer, indicated that Matthew was involved in the shooting. The police reports submitted by the State contradicted this point, indicating that only Ricky was involved in the shooting, and that Ricky and two unknown accomplices between the ages of 16 and 20 were involved in the beating the prior day.[7] At the hearing on the motion *in limine*, defense counsel seemed to concede that Matthew was not involved in the shooting. Defense counsel indicated that he would "put aside" Joseph's proffer about the incident and rely solely on defendant's testimony. Notably, when defense counsel attempted to elicit testimony from defendant about this incident and other "prior beatings" at trial, defense counsel acknowledged in a sidebar with the trial court that defendant did not know who shot at him in April 2010. Thus, it seems defendant would have testified that Ricky was the one who shot at him in April 2010 if the court had allowed that testimony.

¶ 83    Defense counsel nonetheless sought to introduce the evidence to demonstrate the contentious relationship between defendant and Ainedia's family. The court found that the evidence was not admissible because "[t]his is not situation where just because the Hatfields have been fighting the McCoy[s] for generations does not mean that all prior incidents have to come in. It has to directly relate to the issues involved here." The court therefore denied the motion *in limine* because the proposed evidence did not involve either of the victims. We cannot say that such a ruling was an abuse of discretion.

---

[7]The State provided that Matthew would have been 30 years old in April 2010 at the time of the alleged beating and shooting.

¶ 84    As this court has explained, "*Lynch* deals with aggressive or violent character evidence of the defendant's *victim*, to show that the defendant was justified in harming the victim because the victim was a primary aggressor." (Emphasis in original.) *People v. Figueroa*, 381 Ill. App. 3d 828, 843 (2008). Quite simply, the evidence at issue here was not admissible under *Lynch* because there was no suggestion, other than Joseph's proffer, which defense counsel elected to "put aside," that Matthew, defendant's victim, was involved in the prior incidents. Evidence that Ricky shot at defendant four years prior to the altercation between defendant and Matthew in this case is simply irrelevant to the issues involved here. See *People v. Ciavirelli*, 262 Ill. App. 3d 966, 973 (1994) ("Since there is no evidence that any man who was involved in those [prior] incidents was the aggressor in the present case, any evidence of violent acts by men in the group other than [the victim] would be extraneous and irrelevant, even under the second prong of the *Lynch* analysis."). Defendant asserts before this court that defense counsel was attempting to introduce evidence that Matthew was involved in the April 2010 shooting, but, as discussed, that assertion is simply belied by the record.

¶ 85    Moreover, the evidence defendant sought to introduce was simply too uncertain to be admissible. This court has recognized that although criminal convictions are not necessary for evidence to be admissible under *Lynch*, a "mere arrest" is not admissible because it is not sufficient to establish the person arrested actually performed any of the charged acts. *People v. Huddleston*, 176 Ill. App. 3d 18, 28-29 (1988). We recognize that a prior altercation or arrest without a conviction can be adequate proof of violent character when supported by firsthand testimony as to the victim's behavior, but there must be some proof that the victim committed the crimes or violent acts. *Cook*, 352 Ill. App. 3d at 128. In this case, defendant's proposed evidence did not even reach the level of a "mere arrest." Considering the proposed testimony along with the police reports, the

proposed evidence amounted to testimony that someone else in the victim's family may have been involved in a shooting that targeted defendant four years prior to the incident involved in this case. Such evidence is clearly not within the ambit of *Lynch*. Accordingly, we find no abuse of discretion and conclude that the trial court appropriately excluded this evidence where it could not properly be used to establish that Mathew had a violent character.

¶ 86                                6. *Ineffective Assistance*

¶ 87    We observe that defendant raises an alternative argument: that his trial counsel was ineffective in failing to call Rosemarie to testify about a 2013 assault by Matthew that targeted defendant. Because we are remanding this case for a new trial, we find it unnecessary to address this alternative contention. On remand, defendant's counsel can examine this evidence and determine whether to present it.

¶ 88                                C. Defendant's Sentence

¶ 89    As noted, defendant contends that his sentence is excessive and that the trial court erred in considering the offense itself as the primary aggravating factor. Because we remand for a new trial and vacate defendant's convictions and sentences, we need not address this contention.

¶ 90                                III. CONCLUSION

¶ 91    For the reasons stated, we reverse defendant's convictions, affirm the trial court's denial of defendant's motion *in limine*, and remand for a new trial.

¶ 92    Affirmed in part, reversed in part, cause remanded.